**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KIMBERLY BANKS and CAROL CANTWELL, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>R.C. BIGELOW, INC., a corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | No. 2:20-cv-06208-DDP (RAOx) |

**DECLARATION AND EXPERT REPORT OF CORY CARTER**

I, Cory Carter, declare as follows:

1. I have been retained by counsel for the plaintiffs Kimberly Banks and Carol Cantwell ("Plaintiffs") in the above-captioned matter. If called upon to testify, I would and could testify competently to all such subject matter in this Declaration and Report.

## I. INTRODUCTION

2. I understand that Plaintiffs, on behalf of themselves and all other similarly situated consumers in the State of California, have filed a lawsuit against R.C. Bigelow, Inc. ("Defendant") alleging that Defendant has made and continues to make a false and misleading *Made in the USA* claim.[1]

3. In particular, Plaintiffs challenge several of Defendant's products sold at retail that contain tea and that bear the claims "Manufactured in the USA 100% American Family Owned" and "America's Classic" on their containers. These tea products include but not are limited to Bigelow Green Tea, Earl Grey, and Constant Comment (hereinafter, "the Products").[2]

4. For ease of reference, I will refer to the statement "Manufactured in the USA 100% American Family Owned" as the "*Manufactured in USA* claim" throughout the rest of this Report.

5. I understand that Plaintiffs' allegations are that the tea in the Products is manufactured in countries such as China, India, and Sri Lanka. The manufacturing process involves transformation of the *Camellia sinensis* (the tea plant) from a raw ingredient into a consumable good.[3]

6. I further understand that Plaintiffs allege the *Manufactured in USA* claim on the Products' container is false and deceptive and likely to mislead reasonable consumers into

[1] *See* First Amended Complaint ("FAC").
[2] *See* FAC ¶¶ 15-16, 32.
[3] *See* FAC ¶¶ 17-30.

believing the Products are made in the USA.[4] I understand that Plaintiffs may seek certification of a Class of California consumers and that they may also proceed to trial on their claims.[5]

7. I have been asked by Plaintiffs' counsel to draw upon my experience in advising companies on federal and state regulations governing food product labeling claims, including country of origin claims, and *Made in USA* claims in particular, to opine on matters regarding Defendant's use of the *Manufactured in USA* claim and "America's Classic" statement on the Products.

8. My ultimate opinions are summarized in the Conclusion section of this Report and outlined below:

a. Based on the standards typically applied and well understood among compliance professionals in the field of product labeling, the *Manufactured in USA* claim printed on the Products' cartons is an express unqualified *Made in USA* claim. The "America's Classic" statement printed on the Products' cartons is an implied unqualified *Made in USA* claim. *See* Section IV.A.

b. Based on the standards typically applied and well understood among compliance professionals in the field of product labeling, the Products do not meet the standard for an express unqualified *Made in USA* claim, and consequently, the *Manufactured in USA* claim is false and likely to mislead consumers regarding the U.S. origin of the Products. The "America's Classic" statement exacerbates this consumer deception. *See* Section IV.B.

---

[4] *See* FAC ¶¶ 31-34.

[5] *See id.* ¶ 43, Demand for Jury Trial.

9. If called upon to testify in this case, the testimony I would offer would be based on the opinions and information contained in this Declaration and Expert Report and based on my years of experience as a compliance professional in the field of product labeling. I reserve the right to supplement or modify my opinions, if warranted, and to offer additional testimony rebutting any evidence or arguments advanced by Defendant or any other witness, and to comment on any reports submitted in connection with this case. I may also testify in rebuttal to testimony or opinions offered by other witnesses. At hearings, I may rely on material and documents produced in this case by Defendant, any other party and/or third parties, as well as documents that the parties have exchanged or that counsel for the Plaintiffs may provide and publicly available information. Also, I may rely on visual aids and demonstrative exhibits.

10. Plaintiffs' counsel has retained my services at the hourly rate of $415. My compensation is not contingent on the results of my work or any outcome of the litigation.

## II. PROFESSIONAL AND ACADEMIC BACKGROUND

11. I began my career in regulatory affairs in 2003 and have been advising companies in this field since that time. My CV is attached as **Exhibit A**, along with some highlights below.

12. I graduated from Brigham Young University in 2003 with a dual degree in Zoology and Russian Language and Literature. I was published as an undergraduate at Brigham Young University, specifically in environmental organic chemistry from various forms of emissions. In 2014, I obtained a Masters of Jurisprudence, with an emphasis on global food law, from the Michigan State College of Law. I am not an attorney or involved in the practice of law.

13. I have been working in regulatory compliance since 2003, or for approximately 19 years.

14. Between 2003 and 2007, I worked as a regulatory specialist, then as regulatory manager at Neways International, an international dietary supplement and cosmetic company. While working as the Manager, I was responsible for reviewing all formulations and scientific evidence to ensure the formula had sufficient concentrations of ingredients to match the scientific evidence for the suggested claims. I was also responsible for overseeing a team of regulatory specialists responsible for ensuring products met requirements to be exported to markets outside the US and to make the desired claims, including reviewing Harmonized Tariff Schedule ("HTS") codes and country of origin claims.

15. In 2010, I was hired as a Director of Global Regulatory Affairs by the Roll Law Group. I served in that role until 2016. The Roll Law Group is an independent law firm that provided legal support and advice for companies and holdings held by Roll International (now called The Wonderful Company). My formal employment was moved from the Roll Law Group to the Wonderful Company in about 2015 simply for company restructuring purposes. I continued to act in the same role and support the law firm as I had prior to the restructuring until I left the Wonderful Company / Roll Law Group in 2016.

16. While at the Roll Law Group, I served as a subject matter expert in many cases relating to misleading advertising and the Lanham Act with respect to consumer products. This work included reviewing and providing rebuttal to expert witness statements and testimonies. For example, I served as a subject matter expert in the case *POM Wonderful LLC v. Coca-Cola*, 134 S.Ct. 2228 (2014), a case that focused on labeling violations. In this case, Pom Wonderful ("POM") sued Coca-Cola, asserting Coca-Cola was misleading consumers by highlighting the presence of pomegranate juice in the product through the use of vignettes and the product name (e.g., "pomegranate blueberry juice flavored blend of 5 juices"). The product contained <1%

pomegranate juice and was over 95% apple and grape juice. In this case, I assisted POM's counsel with understanding labeling regulations and laws associated with product names, ingredient declaration, and percent juice declaration. I reviewed Coca-Cola's labeling and provided analysis regarding how and why the Coca-Cola labels would be considered misleading under current labeling regulations, focusing on what regulations applied when a specific ingredient was highlighted in the product name or on the label.

17. In *POM Wonderful LLC v. Welch Foods, Inc.*, 468 F. App'x 688 (9th Cir. 2012), POM's counsel asked that I serve as the in-house expert to develop rebuttal for expert witnesses for Welch Foods. I prepared reports on the topics of ingredient declaration on the labels and responding to the declaration of Elizabeth Campbell (in support of Welch Foods). Ms. Campbell submitted an expert report on behalf of Welch Foods, identifying what she considered to be areas where the Welch's product was compliant with labeling laws. For example, Ms. Campbell testified that the product name "White grape pomegranate flavored blend" was compliant with 21 CFR § 102.33, which governs naming of juice blends. Ms. Campbell also asserted that Welch's depiction of a pomegranate on the front of the label was not misleading under 21 CFR §§ 101.30 and 102.33. I helped prepare a report rebutting Ms. Campbell's assertions, and specifically, that it was misleading for Welch to highlight the presence of an ingredient if the percentage of such ingredient was not also disclosed in the ingredient list or elsewhere on the product label.

18. A third case I worked on while at the Roll Law Group that is worth noting is *POM Wonderful v. Federal Trade Commission*, No. 13-1060 (D.C. Cir. 2015). In this case, the Federal Trade Commission ("FTC") alleged that POM had misled consumers by misrepresenting scientific evidence associating pomegranate products with various health benefits, such as prostate health. From the time the FTC issued its order until I left POM, I was responsible for reviewing scientific

evidence and claims made by POM to ensure the claims were true, not misleading, and represented the scientific evidence. Where needed, I would propose alternative language to ensure POM did not misrepresent the scientific evidence associated with the advertising claims.

19. I began offering regulatory affairs consulting services independent of my full-time work in 2007. I continued to consult from 2007 until 2016 when I left POM to become a full-time consultant. I now serve as CEO of Carter Regulatory Group, a consulting form providing creative, practical and comprehensive regulatory solutions, in the context of labeling food, supplements, cosmetics and other consumer products.

20. During my consulting career, I have advised food and drug companies in areas of labeling, advertising, consumer deception, US and international regulatory compliance, product safety and quality systems, and other areas as needed. I have represented companies when the Food and Drug Administration ("FDA") and FTC have sought action against my clients, including negotiating the release of products from customs, convincing the FDA that claims were in compliance with FDA labeling regulations, and advising companies on how to address FTC notices.

21. Companies often want to highlight that they are an American company and/or that the goods they sell are American made. In the course of my consulting practice, I regularly advise clients as to whether they can truthfully and accurately make a *Made in USA* claim in the context of applicable laws, regulations and requirements.[6]

## III. MATERIALS CONSULTED

---

[6] I am not waiving any rights of privilege or confidentiality by describing my consulting practice on these issues in general terms.

22. Industry standards regarding *Made in USA* claims are primarily based on federal law. Thus, in the course of my consulting practice relating to the use of *Made in USA* claims, I and other compliance professionals in the field of product labeling, will look to federal law and FTC regulations, guidelines, enforcement actions, etc. I will also consider state law and other authorities as may be appropriate. In forming the opinions and conclusions herein, I reviewed relevant authorities, cited throughout this Expert Report.

23. In addition, I have reviewed the Parties' allegations as reflected in the First Amended Complaint and the Defendant's Motion to Dismiss. For the purposes of my analysis, I accept the allegations cited herein as the truth. I reserve the right to consider evidence developed in this case, and other materials, to the extent they would bear on new, different, or additional facts that may be relevant to my opinion.

## IV. OPINIONS

### A. The *Manufactured in USA* claim is an Express Unqualified *Made in USA* Claim and "America's Classic" is an Implied Unqualified *Made in USA* Claim.

24. Based on standards typically applied and well understood among compliance professionals in the field of product labeling, it is my opinion that the *Manufactured in USA* claim is an express unqualified *Made in USA* claim and the "America's Classic" statement is an implied unqualified *Made in USA* claim.

25. By way of background, the FTC regulates *Made in the USA* claims under section 5 of the FTC Act (15 U.S.C. § 45). The FTC published a final rule titled "Made in USA Labeling Rule," 16 C.F.R. Part 323, effective August 13, 2021, which essentially codified long-standing FTC positions and guidance on *Made in USA* claims.

26. This Rule states in pertinent part:

The term Made in the United States means any unqualified representation, express or implied, that a product or service, or a specified component thereof, is of U.S. origin, including, but not limited to, a representation that such product or service is "made," "manufactured," "built," "produced," "created," or "crafted" in the United States or in America, or any other unqualified U.S.-origin claim.[7]

27. In other words, the terms "made" and "manufactured" mean the same thing in the context of a *Made in USA* claim. I note that this was not a change in the FTC's position. The FTC has historically and consistently taken the position that the terms "made" and "manufactured" are synonymous. For example, in enforcement actions, the FTC's position has always been that "'Made in the United States" (i.e., a *Made in USA* claim), means any representation, express or implied, that a product or service, or a specified component thereof, is of U.S.-origin, including, but not limited to, a representation that such product or service is 'made,' 'manufactured,' 'built,' 'produced,' or 'crafted' in the United States or in America, or any other U.S.-origin claim.[8] Other materials confirm the same.[9]

28. Thus, I advise my clients that there is no distinction between "made" and "manufactured" in the context of a *Made in USA* claim. Here, it remains my opinion that the *Manufactured in USA* claim is a *Made in USA* claim.

29. Because the FTC considers both express and implied *Made in the USA* claims when determining whether consumers may be deceived, I advise companies regarding both types of claims in the scope of my consulting practice.

---

[7] *See* C.F.R. § 323.1.

[8] *See FTC v Gennex Media LLC* – Docket C-4741, April 9, 2021, p. 3.

[9] *See* FTC, Request for Public Comment on Proposed Guides for the use of U.S. Origin Claims, 62 Fed. Reg. 25020- 01, *25045 (May 7, 1997) ("This provision further distinguishes claims about specific processes from general or indefinite claims such as 'created,' 'produced,' or 'manufactured' in USA, which are likely to be viewed as synonymous with 'Made in USA.'").

30. An express claim is easy to identify because it is a direct claim about the product and typically printed directly on packaging or advertising materials, or expressed in non-written advertising materials, such as radio commercials. Here, a claim such as "Made in USA," "USA," or the statement "Manufactured in the USA 100% American Family Owned" (used on the Products in this case), are express *Made in USA* claims.[10]

31. Defendant's use of the term "100%" in the *Manufactured in USA* claim merits a further point. Consumers could likely understand the term "100%" to modify the phrase "Manufactured in the USA" and "American Family Owned" because visually it is sandwiched between the two clauses, and it is printed in larger font than the two clauses.

32. It is my opinion that the phrase "Manufactured in the USA" standing alone is an express *Made in USA* claim that is deceptive based on the facts as I understand them. I observe that if the "100%" modifies "Manufactured in the USA," this would accentuate consumer confusion.

33. An implied claim is one in which a company doesn't directly say anything about where a product is made but uses images and phrases, such as the American flag, which could cause a reasonable consumer to infer a product is made or produced in the U.S. The FTC provides an example of an implied claim:

> A company promotes its product in an ad that features a manager describing the 'true American quality' of the work produced at the company's American factory. Although there is no express representation that the company's product is made in the U.S., the overall – or net – impression the ad is likely to convey to consumers is that the product is of U.S. origin.[11]

---

[10] *See* Federal Trade Commission, "Complying with the Made in USA Standard," p. 2, December, 1998 ("*Complying with the Made in USA Standard*").

[11] *See Complying with the Made in USA Standard*, p. 3.

34. "In identifying implied claims, the Commission focuses on the overall impression of the advertising, label, or promotional material. Depending on the context, U.S. symbols or geographic references (for example, U.S. flags, outlines of U.S. maps, or references to U.S. locations of headquarters or factories) may convey a claim of U.S. origin either by themselves, or in conjunction with other phrases or images."[12]

35. I understand that Defendant prints the phrase "America's Classic" on the Products' containers. It is not difficult to imagine that this statement could cause a reasonable consumer to infer the Product is made or produced in the U.S. This particularly true in context—i.e., when considered alongside the *Manufactured in USA* claim. Thus, it is my opinion that "America's Classic" is an implied *Made in USA* claim. It is also my opinion that the "America's Classic" is likely to bolster the likelihood of consumer deception that the Products are made in the U.S.

36. I next consider whether the *Manufactured in USA* claim and the "America's Classic" statement are qualified or unqualified. It is my opinion that both are unqualified.

37. The FTC's position is that a "qualified *Made in USA* claim is appropriate for products that include U.S. content or processing but don't meet the criteria for making an unqualified *Made in USA* claim."[13] However, the FTC cautions to "avoid qualified claims unless the product has a significant amount of U.S. content or U.S. processing."[14]

38. According to the FTC, a "qualified *Made in USA* claim describes the extent, amount or type of a product's domestic content or processing; it indicates that the product isn't entirely of

---

[12] *See id.*
[13] *See Complying with the Made in USA Standard*, p. 9.
[14] *See id.*

domestic origin. It then provides the following examples: "60% U.S. content." "Made in USA of U.S. and imported parts." "Couch assembled in USA from Italian Leather and Mexican Frame."[15]

39. The takeaway from these examples is that qualified *Made in USA* claims can be appropriate as long as they truthfully and accurately convey the extent of the foreign content. For my purposes, however, these examples illustrate that the *Manufactured in USA* claim and the "America's Classic" statement are not qualified claims because they say nothing about the source of the foreign-processed tea, or other foreign ingredients for that matter.[16]

40. In sum, the *Manufactured in USA* claim printed on the Products' cartons is an express unqualified *Made in USA* claim. The "America's Classic" statement printed on the Products' cartons is an implied unqualified *Made in USA* claim.

### B. The Products do not Meet the Standard for an Express Unqualified *Made in USA* Claim.

41. Based on standards typically applied and well understood among compliance professionals in the field of product labeling, it is my opinion that the Products do not meet the standard for an express unqualified *Made in USA* claim. As a result, the *Manufactured in USA claim* is false and deceptive and likely to mislead consumers.

42. When engaging in this analysis, I look to the "Made in USA Labeling Rule," as well as other FTC guidance, which are co-extensive with each other.

43. The FTC has limited authority under 15 USC § 45, so it must base its rule on consumer deception, in other words, would consumers be deceived by a *Made in the USA* claim?

44. The starting point is that "consumers are likely to understand an unqualified U.S. origin claim to mean that the advertised product is 'all or virtually all' made in the United States.

---

[15] *See id.*
[16] *See* FAC ¶ 19.

Therefore, when a marketer makes an unqualified claim that a product is *Made in USA*, it should, at the time the representation is made, possess and rely upon a reasonable basis that the product is in fact all or virtually all made in the United States."[17]

45. The "Made in USA Labeling Rule" states in pertinent part:

> It is an unfair or deceptive act or practice to label any product as Made in the United States unless the final assembly or processing of the product occurs in the United States, all significant processing that goes into the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States.[18]

46. Previously, the FTC's position was to take a holistic approach, and consider each of the foregoing factors, recognizing that there was no "bright-line" to establish if the "all or virtually all" standard is met.[19]

47. Now, the Made in USA Labeling Rule clarifies that in order to make an unqualified *Made in USA* claim, each of the following criteria must be met (1) the final assembly or processing of the product occurs in the United States, (2) all significant processing that goes into the product occurs in the United States, and (3) all or virtually all ingredients or components of the product are made and sourced in the United States. Ultimately, "all or virtually all" means that "all significant parts and processing that go into the product must be of U.S. origin. That is, the product should contain no — or negligible — foreign content."[20] If this standard is not met, an unqualified *Made in USA* claim is false and therefore deceptive as to consumers.

48. It is my opinion that Defendant does not meet the standard of the Made in USA Labeling Rule. This opinion is based on my understanding of the facts. I understand that the tea in

---

[17] *See Complying with the Made in USA Standard*, p. 23.
[18] *See* 16 C.F.R.§ 323.2.
[19] *See Complying with the Made in USA Standard*, p. 24.
[20] *See id.*, p. 4.

the Products is wholly manufactured at foreign tea processing plants, and that this process involves transformation of the *Camellia sinensis* plant into green, oolong, or black tea, which Bigelow then imports.[21]

49. Based on these facts, it cannot be said that the Products contain no — or negligible — foreign content. Nor can it be said that all significant processing that goes into the Products occurs in the United States. This case is a classic example of what the FTC referred to when it indicated that an unqualified *Made in the USA* claim would be deceptive because the processing that took place overseas "reflects a significant amount of the product's overall processing."[22]

50. The FTC provides the following illustrative example:

> A table lamp is assembled in the U.S. from American-made brass, an American-made Tiffany-style lampshade, and an imported base. The base accounts for a small percent of the total cost of making the lamp. An unqualified *Made in USA* claim is deceptive for two reasons: The base is not far enough removed in the manufacturing process from the finished product to be of little consequence and it is a significant part of the final product."[23]

51. Applying the principle articulated above, the tea—as with the base in the table lamp example—is not far enough removed from the overseas manufacturing to be of little consequence. My understanding is that Defendant does not transform the imported tea. Moreover, the tea is an integral part of the finished good. As a result, my opinion does not change even if the Products are blended, packaged, and distributed in the U.S., which I understand Defendant asserts to the case.[24]

52. The FTC also discusses whether "raw materials are included in evaluation of whether a product is all or virtually all made in the U.S." As a starting point, the tea is not a "raw material" because it is highly processed and consumable at the time that Defendant imports it. That

---

[21] *See* FAC ¶¶ 17-30.
[22] *See Complying with the Made in USA Standard*, p 5.
[23] *See id.* p 6.
[24] *See* Motion to Dismiss, p. 2-3.

is quite different from the FTC's position on raw materials: "products such as minerals, plants or animals that are processed no more than necessary for ordinary transportation."[25]

53. However, my opinion would not change even assuming the tea and other ingredients are considered raw materials. According to the FTC, a determination of whether raw materials are included in considering an unqualified *Made in USA* claim with respect to merchandise (i.e., not a component of the merchandise) "depends on how much of the product's cost the raw materials make up and how far removed from the finished product they are." The FTC then gives contrasting examples of a gold ring and plastic clock radio:

> If the gold in a gold ring is imported, an unqualified *Made in USA* claim for the ring is deceptive. That's because of the significant value the gold is likely to represent relative to the finished product, and because the gold — an integral component — is only one step back from the finished article. By contrast, consider the plastic in the plastic case of a clock radio otherwise made in the U.S. of U.S.-made components. If the plastic case was made from imported petroleum, a *Made in USA* claim is likely to be appropriate because the petroleum is far enough removed from the finished product, and is an insignificant part of it as well.[26]

54. Here, the foreign-sourced tea is akin to gold in the above ring example—both are integral materials that are one step removed from the finished product. Put differently, the tea is the predominant reason why a consumer buys the Products, and thus, even if it were considered raw material, its foreign content must be considered in the context of an unqualified *Made in USA* claim. By contrast, the foreign-sourced tea is unlike the petroleum in the above plastic clock radio example, where the plastic is far removed from the foreign petroleum, nor is the plastic a significant part of the end-product. As a matter of common sense, consumers do not buy the clock radio because of its plastic.

---

[25] *See Complying with the Made in USA Standard*, p. 35, n. 18.
[26] *See Complying with the Made in USA Standard*, p. 8.

55. I am informed that the Parties have stipulated that Plaintiffs will not be pursuing a claim under Cal. Bus. & Prof. Code § 17533.7 (California's Made in USA statute) and that Defendant has waived the safe harbor provisions of the statute as a defense. *See* Cal. Bus. & Prof. Code § 17533.7(c)(1), (A) and (B). Therefore, in this Report I do not offer an opinion as to whether the Products are deceptive specifically in the context of Cal. Bus. & Prof. Code § 17533.7, however, to the extent it becomes relevant, I reserve the right to do so in the future.

## V. **CONCLUSION**

56. I drew on my 19 years in food, drug and cosmetic regulatory experience, both domestic and international, to reach my opinions. I have advised clients regarding *Made in USA* claims in many instances over the course of my career, applying both federal and, when appropriate, state laws, rules, and regulations. I also utilize my extensive knowledge of industry practice and regulatory enforcement to identify and establish risk-based parameters for my clients.

57. Based on standards typically applied and well understood among compliance professionals in the field of product labeling, and in my expert opinion, the *Manufactured in USA* claim is an express unqualified *Made in USA* claim and the "America's Classic" statement is an implied unqualified *Made in USA* claim.

58. Based on standards typically applied and well understood among compliance professionals in the field of product labeling, and in my expert opinion, the Products do not meet the standard set forth under the Made in USA Labeling Rule. Further, because the Made in USA Labeling Rule is based on whether consumers are deceived by a *Made in the USA* claim, it is my opinion that the *Manufactured in USA* claim here is likely to mislead consumers that the Products are made in the USA. The "America's Classic" statement, particularly in the context of the

*Manufactured in USA* claim, is likely to bolster consumer deception regarding the U.S.-origin of the Products.

59. If a company were consulting me based on the same facts and information described herein, I would advise them against making any type of *Made in USA* claim, qualified or unqualified. I would certainly advise them against making an express unqualified *Made in USA* claim, as Defendant has done in this case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Rexburg, Idaho on June 15, 2022.

Cory Carter

# EXHIBIT A

**CORY CARTER**

3416 Lombardy Street, Rexburg, Idaho 83440

208.419.5231 CORY@REGMINDS.COM

**REGULATORY & QUALITY PROFESSIONAL**

## PROFESSIONAL PROFILE

- Regulatory and quality expert with strong strategic, analytical and leadership skills. 16+ years leveraging legal, regulatory and scientific/technical expertise to support food, drug, cosmetic, and fresh produce manufacturers and retailers.
- Skilled strategist who develops and implements regulatory and compliance programs across functional areas to monitor regulatory and legislative trends that impact the business' overall goals. Executes regulatory strategy to maintain an organization's vision, growth and competitiveness, while balancing regulatory and liability risks.
- Strong advocate working with government agencies and industry associations to address areas of impact on US domestic and global regulatory and legislative activities that impact consumer goods. Manage professional relationships with industry associations, legal and scientific professionals, suppliers and industry stake-holders worldwide.

## AREA OF EXPERTISE

- Drug cGMP Auditor
- ASQ Certified Quality Auditor
- Cross-functional Team Leadership
- Regulatory Strategy Development and Execution
- Litigation Support
- Food Safety Modernization Act (FSMA)
- Food and Drug Laws and Regulations
- Recalls
- Media and Consumer Communication/Complaints
- Quality Management System Development
- Competitive Advertising and Risk Management
- Compliance
- Regulatory Risk Analysis
- Mentoring and Training
- Regulatory Inspections/Audits
- Labeling Compliance
- Product Registration and Government Approval
- California Proposition 65
- Product Classification
- Global Market Expansion
- Negotiation and Communication
- Complex Problem Solving
- Industry Consensus Building
- SOP

## EMPLOYMENT AND INDUSTRY EXPERIENCE

**Owner/Managing Director, *Carter Regulatory Group*, Rexburg, Idaho** June 2007- Present

- Conduct contract manufacturer audits for cGMP compliance under US drug cGMP regulations (21 CFR 210 and 211), FSMA (21 CFR 117), dietary supplement cGMP regulations (21 CR 111), and cosmetic regulations and guidance.
- Develop and oversee development of quality management systems in manufacturing facilities, including drug and food systems (cGMP, ISO, SQF, FSMA).
- Develop sanitation procedures and systems.
- Provide proactive regulatory strategies to developing and established companies in food, beverage, dietary supplement, OTC drug, and cosmetic industries.
- Analyze scientific substantiation to identify and classify risks in consumer advertising compliance, including consumer deception, industry best practices, and private party litigation.
- Conduct regulatory analysis and provide guidance in areas of labeling, advertising, claim substantiation, FSMA, cGMP, product registration, and import/export regulations.
- Assess regulatory risk and assist clients in responding to regulatory agency enforcement.
- Provide expert witness services in US and international litigation

- Develop and improve global food safety compliance programs, including SQF documentation, HACCP, and USDA compliance programs.
- Hire and train regulatory professionals.
- Represent clients in negotiations with FDA to address Form 483 observations
- Represent client to reverse mandatory recall initiatives for drug compounding pharmacies through inspectional activities and direct negotiation with FDA.
- Represent clients in FDA and USDA audits.
- Advise on infant formula regulations regarding new and innovative ingredients not yet approved for infant formulas in the US.

**Director Global Regulatory Affairs, *Roll Law Group / The Wonderful Company*, Los Angeles, CA** May 2010- January 2016

- Directed regulatory functions and served as regulatory expert for multidisciplinary global expansion team for POM Wonderful and Paramount Farms.
    - Examples of regulatory functions include EU novel food compliance, POM v FTC discovery and litigation, FDA inspections, consumer protection, Proposition 65, labeling, advertising compliance, claim substantiation, cGMP, product registration, FDA and CBP import detention negotiation.
- Represented pomegranate and pistachio industries as member of multiple industry associations to develop responses to FDA's proposed FSMA regulations on behalf of the tree nut, fruit juice, and fresh produce industries. Developed a FSMA compliance strategy for the Wonderful companies, including conducting FSMA compliance audits.
- Represented pistachio industry in top-level negotiations with FDA, EPA, USDA, and European regulators to address food safety and pesticide regulatory enforcement actions.
- Maintained leadership roles in several US and international industry associations involved in regulatory activities that impacted the Wonderful Brands portfolio of products.
- Provide litigation support in Pom v FTC, Pom v Coke, Pom v Welch's, and other trials through claim development, expert witness rebuttal, and US labeling analysis.

**Challenges & Notable Accomplishments**

- Successfully negotiated with FDA to remove imported products from automatic detention
- Validated substantiation and advertising compliance to ensure POM compliance with FTC compliance orders.
- As a leading member of the California Tree Nut Coalition, engaged top US and EU regulatory officials, European technical experts and industry associations, to develop and execute a unified strategy to extend a temporary pesticide MRL, effectively removing a trade barrier constituting tens of millions of dollars of US exports to the EU.
- Negotiated agreement with international trade associations to avoid pending litigation due to alleged labeling violations.
- Authored response to FDA's call for information related to microbiological risks related to tree nut processors.

**Director Quality and Regulatory Affairs, *UST Corporation*, Layton, US** January 2009 – April 2010

- Developed and executed quality and regulatory functions in dietary supplement and food manufacturing facility.
- Managed quality team

**Director Regulatory and Legal Affairs, *Bionovix*, Scottsdale, AZ** June 2007 – January, 2009

- Developed all technical and legal systems for a consumer goods (cosmetic and dietary supplement) startup company.
- Facilitated international expansion into Asia through developing strategies to enter key markets in the most cost and time effective manner.
- Developed and executed operating procedures for regulatory compliance, R&D, Quality, contract manufacturing management, scientific claim substantiation, vendor relations, and new product development
- Established change control and consumer complaint/adverse event reporting and traceability systems.

**Manager International Regulatory Affairs, *Neways International*, Springville, UT** March 2005- June 2007

- Managed International Regulatory Affairs team, and directed compliance functions with a $1M budget in 30-40 countries (revenue ~$400M).
- Developed country specific resources to facilitate product compliance activities, such as product registration, labeling compliance, and claims substantiation.
- Hired and trained regulatory professionals in food, dietary supplement, cosmetic, and chemical regulations

**Challenges & Notable Accomplishments**

- Oversaw claim substantiation, analyzing scientific accuracy and strength, compiling substantiation summaries, and

advising senior management on scientific and regulatory risk.
- Managed and trained regulatory staff to **review and approve ingredients, product formulas, labeling and packaging** for compliance in international markets; implemented review process and cross-training programs;
- Provided interpretations and requirements under **cGMP and other manufacturing regulations in the US based on regulations**, industry position, and FDA enforcement; consumer safety; quality assurance and risk assessments on manufacturing specs (e.g. label claims; identification; microbiology; heavy metals, method of manufacture, etc.); developed business options.
- Developed scientific and regulatory rational to address **regulatory crisis** threatening Neways (~$700M) transaction deal with Golden Gate Capital; resolved compliance issues with Japan Ministry of Health that allowed the transaction to complete;
- Advised executive team of regulatory risks associated with new product development and product specification non-conformances.

**International Product Registration Specialist, *Neways International*, Springville, UT** August 2003 - March 2005
- Managed international product registration activities for over 100 cosmetic, personal care, household chemical, and dietary supplement SKUs in 9 Eastern European (Russian-speaking) markets. Managed in-country consultants and registration experts to ensure product licensing and labeling was accurate and complete to meet marketing timelines;
- Developed technical specifications and documentation systems to enhance product registration globally (about 30 – 40 markets).

## GOVERNMENT, INDUSTRY AND LEGISLATIVE AFFAIRS

***International Tree Nut and Dried Fruit Association (INC)***, Reus, Spain 2015 - 2016
**Scientific and Government Affairs Committee**

- Actively participated in the development of INC communications, member interests and consensus building; framed issues, strategy and position; participated in negotiation and drafting of formal comments/position papers to EU agencies advocating industry position; discussed trade recommendations and guidance policies as part of industry's self-governing efforts.

***Almond Board of California,* Bakersfield, CA** 2011 – 2013
**Technical and Regulatory Affairs Committee**
- Developed regulatory and government relations strategies to facilitate trade; established industry education priorities and strategies related to FSMA; engaged in industry relations with EU regulators to enhance trade through the voluntary aflatoxin sampling program (VASP), effectively reducing regulatory testing of US almond shipments entering the EU.

***Juice Products Association*, Washington DC** 2014 – 2016
**Government Affairs Committee (2014 – 2016); Technical Affairs Committee (2015 – 2016)**
- Negotiated with industry members to encourage development of USP standards for pomegranate juice; developed FSMA strategy and comments to encourage FDA to establish effective regulations; developed juice industry position and advocacy strategy for addressing sugar beverage taxes, 2015 US Dietary Guidelines, FDA nutrition facts proposed revisions, and Canada nutrition facts proposed revisions.

***Peanut and Tree Nut Processors Association*, Alexandria, VA** 2013 – 2015
**Tree Nut Risk Assessment Industry Coalition**
- Developed regulatory and government relations strategies to address FDA public announcement of investigation into safety concerns related to tree nut products; met with FDA representatives to address FDA's information gathering process and intent; met with FDA to discuss results of data collection.

***United Fresh,* Washington DC** 2014
**FSMA Working Group**
- Developed regulatory and government relations strategies to address FDA proposed FSMA regulations.

## LEGAL & REGULATORY PRESENTATIONS

"Produce Safety Rule," authored and presented at the ACI's FDA and USDA Compliance Boot Camp, October, 2013.

"USDA Dietary Guidelines and 'Natural'," authored and presented at the ACI's FDA and USDA Compliance Boot Camp,

Case 2:20-cv-06208-DDP-RAO Document 39-11 Filed 06/28/24 Page 22 of 22 Page ID #:1022

October, 2013.

"The Structure of Chinese Food Law," authored and presented at the China Food Law Symposium, March 2015

"Business Impact of Regulatory Practices," authored and presented at Supplyside West, October, 2016

"Audits: A Customer's Responsibility," authored and presented at Supplyside West, November, 2018

"Contract Service Providers" Overcoming Quality Hurdhen Working With Contract Manufacturers and Co-Packers," authored and presented at Vitafoods Europe, May, 2019

## ACADEMIC INVOLVEMENTS

ASQ, Certified Quality Auditor, 2018
Michigan State University College of Law, Masters of Jurisprudence, Global Food Law, 2014
Michigan State University, Certificate International Food Laws, 2012
Brigham Young University, Bachelor, Zoology and Russian, 2003

Languages: semi-fluent/conversational in Russian

References: available upon request.