UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. JUDGE DEAN D. PREGERSON, JUDGE PRESIDING

| | |
|---|---|
| KIMBERLY BANKS, et al., Plaintiffs, vs. R.C. BIGELOW, INC., et al., Defendants. | NO. 20-CV-06208-DDP |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Monday, June 24, 2024

LISA M. GONZALEZ, CSR No. 5920, CCRR
csrlisag2@gmail.com

APPEARANCES:

FOR THE PLAINTIFFS: WAND LAW FIRM PC
BY: AUBRY WAND, ESQ.
100 Oceangate, Suite 1200
Long Beach, CA 90802
310-590-4503

FOR THE DEFENDANTS: GORDON REES SCULLY MANSUKHANI LLP
BY: TIMOTHY K. BRANSON, ESQ.
101 W. Broadway, Suite 2000
San Diego, CA 92101
619-696-6700

Los Angeles, California; Monday, June 24, 2024;
10:16 a.m.
-o0o-

THE CLERK: Calling Item No. 2, Case Number CV-20-6208, Kimberly Banks, et al., versus R.C. Bigelow, Incorporated, et al.

Counsel, please state your appearances.

MR. WAND: Good morning, Your Honor. Aubry Wand for plaintiffs.

THE COURT: I'm sorry. Get right into that mic, if you could.

MR. WAND: Good morning, Your Honor. Aubry Wand for plaintiffs.

THE COURT: Thank you.

MR. BRANSON: Good morning, Your Honor. Tim Branson for defendant R.C. Bigelow.

THE COURT: Good morning.

Can you spell your last name for me?

MR. BRANSON: B-r-a-n-s-o-n.

THE COURT: Okay. Got it. Thank you.

Okay. I'll start with the plaintiff. It's your case.

Go ahead.

MR. WAND: Thank you, Your Honor.

So there -- of course, there's two pending

motions: Plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment.

I'll start with our motion.

THE COURT: Go ahead.

MR. WAND: We're moving for liability under plaintiff CLRA and express warranty claims. The essential elements of these claims are falsity or deception and materiality.

The claim at issue here is "Manufactured in the USA 100 Percent American Family-owned"; and for ease of reference, I may refer to that as "The Bug."

That's been the terminology the plaintiffs have been using.

Your Honor, in this case --

THE COURT: Interesting terminology because traditionally "The Bug" was a union reference on packaging. You probably don't know that or remember that, but I do.

Okay. Go ahead.

MR. WAND: Thank you, Your Honor.

So Bigelow represents, through The Bug, that the products are manufactured in the USA 100 percent when nearly the exact opposite is true. The undisputed evidence shows that almost the entire product -- the tea, the filter paper and string is foreign made.

Bigelow admits that all it does in the U.S. is

assemble tea bags, also interchangeably referred to as "blending and packaging the tea."

When the Court granted class certification, it correctly recognized that this was Bigelow's defense. Now, it's clear from the evidence, and Bigelow's own briefing and both motions for summary judgment, that its defense on the merits is that "manufactured" means "assembled," but "manufactured" does not mean "assembled."

The meaning of "manufactured," as recognized by this Court, adopting the holding in Colgan on this, means: To make something from hand or by machinery from raw materials. Merriam Webster's definition of "process" is: A series of actions or operations conducing to an end. A continuous operation of treatment especially in manufacturing.

So these two definitions -- these two words clearly have different meanings. No reasonable consumer could believe that "Manufactured in the USA 100 Percent" means blended and packaged in the USA, or assembled in the USA using foreign materials.

Colgan, which confirms this common sense proposition, is on all fours. There, the appellate court --

THE COURT: So "manufactured" equals "made"? You would say that's simply the closest synonym; right?

MR. WAND: Absolutely, Your Honor.

So in Colgan, the Court affirmed the trial court's grant of summary judgment for the plaintiffs on their CLRA claim on the theory that the defendants "Made in USA" representation was false and deceptive with respect to a multi-purpose tool because several components were manufactured abroad, but the tool was designed and assembled in the United States.

Colgan is controlling law. The procedural posture of the case is exactly the same as we have here, and the facts are directly on point.

THE COURT: Have you found any food -- by that, I'm using consumables -- whether they're beverages or food items -- that use the phrase "manufactured" as a designator of origin?

MR. WAND: Your Honor, as far as case law goes, I'm familiar with pet food cases. It's pretty common -- I think some cases have been brought on behalf of false labeling of pet food as Made in USA. That may be the Sabo vs. Wellpet case, and I would say, Your Honor, if you just go to the store, there are plenty of "Made in USA" claims in practice made on food products. Beef jerky, coffee. Plaintiffs' even submitted exhibit -- one of the named plaintiffs submitted some photos of other "Made in USA" claims she brought -- she had bought. One of those -- one of those was like cake flour mix. So it's quite common for

these claims to be made on food -- food products.

THE COURT: Okay.

MR. WAND: And if the Court wants more explanation on that topic, I will absolutely get into that. I mean, I think, Your Honor --

THE COURT: Well, the only reason, I was just thinking about it over the weekend a little bit and just speaking from, you know, just as a consumer -- and maybe I'm unique in this -- but I like to know where things came from because it tells me a little bit about food safety. So I don't know whether tea is covered under country-of-origin regulations or laws or not. I know certain food items are.

So I just have been sort of pondering the whole idea of even using the word "manufactured" because I think consumers are not necessarily interested in where -- you know, in a mechanical process. They want to know what it is that they're putting in their body and where it came from. At least, that's just, you know, my thinking about it. I'm not trying to make law or go beyond the law in this case, but I'm just trying to think about it in broad terms a little bit and maybe my own shopping habits.

You know, I wouldn't want baby formula, for example, that contained peaches grown at Chernobyl to be, you know, cooked over there, and then packaged here with the label "Made in America." That, to me, seems to be something

that the labeling laws and the laws dealing with, you know, falsity and materiality would need to be responsive to.

So, anyway, let's get back into the legal issues in this case. That was an aside. I don't need any comments on it. I just was thinking out loud a little bit.

Go ahead.

MR. WAND: And, just briefly, Your Honor, on that point, while it's fresh in my mind, I agree, that is part of what is going on here. I think that people value "Made in USA" for several reasons: Supporting the American workers and the American economy, also, safety and quality reasons. In the context of what we have here, which is a consumable good, quality is also safety issues. I think that's absolutely part of it.

And I think the facts here show that this tea is manufactured, it is made. Bigelow's own documents -- we submitted many documents where Bigelow calls it "tea making." There's many, many steps to this processing or manufacturing this tea: Withering, heating, drying, oxidizing, cutting, filtering, et cetera. All of these use heavy machinery, and I would direct the Court to Exhibit 41, which is a video we submitted where Bigelow owns the Charleston Tea Plantation. That's not tea directly involved in this case, but that's where it shows how involved this process is for manufacturing tea.

THE COURT: Is the tea that's produced there, is any of it grown in America?

MR. WAND: Yes, Your Honor. For the Charleston Tea Plantation or Charleston Tea Garden --

THE COURT: I was unclear about that. It's all American grown?

MR. WAND: Correct. It's grown here, and it's processed here. And that's all the steps. And Bigelow repeatedly calls outside of the products in this case, "tea manufacturing" or "making tea." So this is not just a raw plant that, then, Bigelow, you know, transforms itself. It is fully processed and manufactured abroad at the time Bigelow imports it, and then all Bigelow does is blend that tea and assemble a tea bag.

So returning to Colgan, Your Honor, as I was saying, the fact -- Bigelow does not meaningfully, from our perspective, distinguish Colgan in any respect, and I don't think it can. The facts are directly on point here.

First, the tea in this product is the guts of the product, which is what Colgan recognized the components in the multi-purpose tool were, the guts of the product. That is why the consumer buys the product.

Here, the facts -- it's undisputed --

THE COURT: What you mean by that is consumers aren't buying a bag, they're not buying a string, they're

not buying the label. Those are convenience items, if we can -- if I can dissect your argument a little bit -- and tea was sold for likely thousands of years without the convenience components.

So the consumable -- the part that goes in your body -- is the residue from the tea leaves; right?

MR. WAND: Yes. Exactly.

THE COURT: Or the tea. You can call it tea. I don't know. You know, it's a component of the actual plant that creates the color and the flavor. You're consuming a portion of the plant essentially. It's been processed, but you're consuming a portion of the plant.

MR. WAND: Precisely, Your Honor. It starts with a tea plant and after this long involved process, it ends up as these fannings, which then go into the tea bag.

THE COURT: Right. Okay.

MR. WAND: Just as in Colgan with the components, the tea here is why consumers buy it, and that's an undisputed fact here.

Colgan also expressly rejected Bigelow's defense, which is that "Assembled in the USA" means "Manufactured in the USA." That is the exact defense the defendant made in Colgan. They said, "Hey, we put together these multi-purpose tools in the United States. We designed it in the United States."

And, actually, in Colgan, the defendant also even did some pretty substantial modification to the foreign components, and I won't read all of it, but on page 691 to 692, it describes all of the extra steps the defendant and Colgan even did to those foreign components. But, again, the Colgan Court held that wasn't -- you can't do that under the "Made in USA" statute and the CLRA.

Colgan also held that there's no need for extrinsic evidence of deception. There's no need, for example, for a consumer survey. Even though to be clear, we have a consumer survey in this case, but in terms -- in the context of our affirmative motion for summary judgment, that's not necessary for the Court to rule in our favor on that.

And this case is even stronger than Colgan, Your Honor, because we have -- well, first of all, in Colgan, some of those products there was multiple components in the tools, and I think in one of them maybe there was only one tool that was foreign made. Here the tea, the filter paper and the string are foreign made.

So essentially almost the entire tea bag is foreign made. We also have the "100 percent" claim, which Bigelow admits modifies "Manufactured in the USA." Colgan didn't have that. Colgan just had a regular "Made in USA" claim. Here we have "Manufactured in the USA 100 percent."

So if there was any doubt, Your Honor, about what "Manufactured in the USA" means, we argue that that is dispelled by the "100 percent" modifier. That means what it says. It's "100 percent manufactured in the USA."

We touched upon this a little bit, but it also doesn't matter if the tea is considered raw material. Again, the tea is not raw material. The evidence strongly supports that --

THE COURT: The manufacturing process itself, it's done offshore. You said it goes through various steps, and you said with heavy machinery, too.

Is there anything in the record about this sort of precision required to do it correctly?

Is this -- is this a process that requires some level of precision, some level of know-how? I'm just trying to understand it a little bit more.

MR. WAND: Well, I hope I can try to answer this question, Your Honor.

First of all, I do recall seeing documents that we submitted in the record that say something to the effect of the tea quality is made and, like, destroyed in the processing of the tea. So I don't know if that answers precision exactly, but I think the gist of that document, which is Bigelow's own document, is that the actual quality of the tea you get is directly dictated by the processing.

And even more broadly, Your Honor, the processing that happens abroad fundamentally dictates the type of tea. That whole process determines whether it's green tea, Oolong tea, or black tea. That's how important it is. So broadly speaking, it's making it, and I think -- I hope this answers your question -- there is evidence where Bigelow acknowledges that --

THE COURT: So it's transformed from a raw agricultural product to something with a particular taste profile?

MR. WAND: That's fair.

Second, Your Honor, even if the blending and packaging, which is what happens in the U.S., is considered part of manufacturing, that does not negate the fact that the process that we were just talking about, which occurs overseas, is also part of the manufacturing process.

Again, the "100 percent" modifier makes that clear. And, again, the filter paper and string are also made abroad, and those are not raw materials. At some point, everything is derived from a raw material. Filter paper and string -- there's no evidence of this directly, but I think it's common sense that filter paper is derived from paper or raw material originally, but when Bigelow gets it, it is finished.

So even putting aside the tea again, we focused on

the tea, Your Honor, but there's also the filter paper and string, which are made abroad.

And, then, lastly, even if the Court looks at tea as a raw material, the FTC guidance makes clear that the inquiry -- even raw materials are considered -- fall within the "Made in USA" laws, and the inquiry is whether the raw material is fundamental to the product and how far it is removed from the product.

So there's the example of gold in a gold ring. The gold in a gold ring, even if it is raw material, would be deceptive if the company called it "Made in the USA" because the gold is so fundamental to the product, and it's just one step removed.

And then the FTC provided this other example of foreign-sourced petroleum in a plastic clock. If the petroleum was foreign-sourced and then a company put together a plastic clock, that would be okay because the petroleum is so far removed from the end product and it's also not the reason why consumers are buying that product. They're not buying the plastic clock for the plastic. They're buying it for the clock.

And, here, again, this case is much, much more like Colgan or the example in the gold ring, where consumers buy the product for the tea, and the tea is not just barely one step removed, if at all. All Bigelow does is blend it

with some other flavoring.

So to summarize, Your Honor, "The Bug" is objectively false and deceptive under the controlling definition of manufacturer.

THE COURT: Was there anything that was derived from discovery that would indicate why Bigelow chose "manufactured" or chose to phrase this Bug the way they did?

MR. WAND: Yes, Your Honor. Some of that I think really goes to this issue of plaintiffs' fraud claim and punitive damages claim and the issue of Bigelow's state of mind and intent. I mean, we submitted evidence -- essentially, Your Honor, in 2017, Bigelow decided to enact this TeaProudly campaign. A very prevalent part of that campaign was "Made in America." So there was a lot of other "Made in USA" claims in various marketing channels. Part of that was the decision was to add "The Bug" to the containers, and at the time Bigelow is considering that claim, they also were considering compliant claims: Blended and packaged, produced, et cetera. So they were considering compliant claims ultimately, and in the same context, Your Honor -- I think this goes a little more to the issue of intent, and I can get into that more -- we submitted e-mails where Cindy Bigelow, the president/owner and other high-level executives were put on notice -- again, they deny seeing those e-mails, but the e-mails speak for themselves.

The subject line is "FTC standard," and they're discussing various options: "Manufactured in the USA," "Packaged in the USA," "Blended in the USA." So they're considering all of these options, and then ultimately even though we argue they're on notice, at least, of the FTC law, and they do no research, they don't talk to anybody, regulatory consultant or attorney or seek any advice -- I don't even think they did a Google search -- they went ahead and went with "The Bug." So there is evidence in the record about how the thought process at the time that they decided to make the bug.

THE COURT: Well, it's also true based upon your domestic factory that tea can be grown and is grown commercially domestically here in the United States; right?

MR. WAND: That's correct, Your Honor.

THE COURT: So it's not -- so the argument that it's common knowledge that all tea comes from India, China or offshore is not necessarily 100 percent true, is it?

MR. WAND: No, it's not. And I think that's part of Bigelow's defense. I mean, I think that supports our case; right? It is not -- it is believable, it is reasonable, it is plausible that tea is grown and produced in the United States. It is not obvious that every tea comes from abroad. So I believe that supports plaintiffs' case there.

THE COURT: Okay. Why don't I come back to you, then.

MR. WAND: Okay.

THE COURT: Is there anything else you want to add?

MR. WAND: I'm happy to come back. The second major part of our motion was the issue of materiality.

THE COURT: Go ahead. Spend a minute on it.

MR. WAND: Just briefly, Your Honor.

We have the California "Made in USA" statute. Kwikset, the California Supreme Court clearly held that the legislature has deemed "Made in USA" claims material as a matter of law as a result of that.

In Hinojos, the Ninth Circuit relied on Kwikset, instructed that district courts must defer to the legislature's determination of materiality. And so we submit, Your Honor, that this is a very clear case where a "Made in USA" claim is material as a matter of law.

THE COURT: So you're saying that a legislative intent as set forth in the statute -- I hate to use the word -- well, is more significant than any survey?

MR. WAND: Right, Your Honor. Our position is that if -- the Court should not consider any evidence because that would entirely defeat the purpose of the holding that a claim is material as a matter of law. That's

just incompatible, and I think, Your Honor, a more nuanced kind of maybe approach to that, which maybe Bigelow is arguing, is it created some sort of rebuttable presumption where, you know, it's material; but it can be rebutted with evidence. But Kwikset didn't say that; Hinojos didn't say that. The authority is very clear that it's material as a matter of law. There's no discussion of some sort of rebuttable presumption, and Bigelow doesn't really challenge, as far as I can tell, that legal principle, but it really just points to other evidence like you had mentioned the survey.

And our position is, one, that's not very convincing, but in the context here, that it's not relevant to whether the claim is "Made in USA" -- the claim is material as a matter of law.

And the Brown vs. Hain case we cited, Your Honor, discussed that issue and followed Kwikset and Hinojos and held the statute was material as a matter of law.

In that case, it was an organic products statute, but it was analagous in that the organic products statute specifically prohibited a percentage -- it was a very specific statute and had very specific parameters, and the Court analogized that statute to the "Made in USA" statute that we have here.

So with that, Your Honor, I'll wrap up for now.

THE COURT: Okay. Thank you.

MR. BRANSON: Thank you, Your Honor.

Good morning.

THE COURT: Good morning.

MR. BRANSON: Lots of ground to cover here. Let me just point out off the top, in terms of the literal falsity argument, plaintiffs have focused on only part of what we're calling "The Bug." So there's the "Manufactured in USA" and then there's the "American Family Owned" part. So there's a part of what's being challenged that is undisputably true, which is the "American Family Owned" part of that. So I just want to make the Court aware that what we're talking about are two statements, not just the one, and that could be problematic --

THE COURT: Well, that's an argument.

MR. BRANSON: It is an argument. The reason I raise it, Your Honor, is in the context of plaintiffs' expert, we've challenged Mr. Weir's work based on the fact that we say he didn't isolate the manufactured part, he didn't test the "American Family Owned," and the Court had said pretty recently that, "Well, we're talking about all of it in context." I think it's relevant because I don't think plaintiff should be able to have it both ways. We're either talking about the entire "bug" or we're talking portions of "The Bug." That's the only reason I raise that issue off

the top, Your Honor.

I think the threshold issue really is: What does "manufactured" mean --

THE COURT: Well, but let's just reduce the argument a little bit. If it says "Manufactured in the USA," it doesn't say "partially manufactured." What do you even need the 100 percent for?

So if the argument is the "100 percent" modifies "family owned," the first part of the phrase -- because they're not sentences, there's no punctuation -- still says "Manufactured in the USA." So it's unqualified.

So is that argument really a good argument?

MR. BRANSON: I think it is because we don't think plaintiffs have focused what their theory of liability is sufficiently, and that's why I raise it.

THE COURT: Thank you.

MR. BRANSON: So, Your Honor, the threshold issue as we see it is what does "manufactured" mean in the context of what our product is, and there's no dispute that our product is a finished tea bag product. And I know there was a discussion about: What is the consumer really buying? We have not seen any objective definition of what "manufacture" means in the context of tea or really any consumable food product. We haven't seen any predicate basis to even equate "manufacturing" with growing or harvesting of tea.

THE COURT: So your argument is consumers care about whether -- whether the tea is inserted into the foreign-made components in America?

MR. BRANSON: I think the point is that plaintiffs haven't sent us any evidence of what consumers care about in the context of tea. We have statements that are not supported of what happens overseas is manufacturing. We have statements from plaintiff that it's not raw tea, but it's actually a finished consumable. No matter how many times I say it, it doesn't make it true. The only evidence of what "manufacturing" means in the context of tea is what Bigelow says it is. And Cindy Bigelow herself says, "You can't manufacture tea. You grow tea." What we're doing in the United States is manufacturing a finished tea bag product. That's what we do, and we have a three --

THE COURT: But what came overseas if it didn't go through the various steps in this process? You couldn't just put it in a tea bag, could you?

MR. BRANSON: Well, no, you couldn't. That's what Bigelow does when it receives it. So overseas is the growing, the harvesting, the processing to determine what kind of tea it will be in terms of levels of oxidation.

THE COURT: How many steps are in that process?

MR. BRANSON: It's six or seven steps, maybe.

THE COURT: How long does it take to go from leaf

that's harvested to ready to be shipped overseas?

MR. BRANSON: I don't know that answer.

THE COURT: Okay. But it's a multi-step process; right?

MR. BRANSON: It's a multi-step process, but it's not manufactured.

THE COURT: You say it's not. So, therefore, I asked you, you can just take the material, the tea leaves that haven't gone through any -- you know, any machines, processes, anything else, and you can just put them in tea bags in America?

MR. BRANSON: No, there's actually -- there's actually steps, Your Honor, that you need -- you need to dose it into filter paper, you need to sew and staple the package together, there's the blending and packaging to have the unique flavors, depending on what the flavors are.

THE COURT: Right. But you have -- at least the argument here, and we've discussed it, you have the phrase "100 percent," or my question to you is: You have no modifier when it says "Manufactured in the USA." So no consumer is likely going to think that means 50-percent manufactured in the U.S. So I'm just asking you to assume that 100 percent means 100 percent. So there isn't even 1 percent of it that is manufactured offshore; is that the argument?

MR. BRANSON: The argument is that the plaintiffs haven't demonstrated what consumers understand "Manufactured in the USA" to mean in the context of our product.

THE COURT: Okay. But is it correct that your argument presumes that zero percent of the manufacturing takes place in an offshore environment?

MR. BRANSON: Yes.

And then just to close that up. Bigelow's fact one about our manufacturing plants in the USA and our own internal manufacturing documentation about what happens in those plants, Your Honor, Exhibits 1-J and K, I think those are important to look at because Bigelow talks about raw tea, they talk about other components that are involved in the process. So that's the evidence we have. We don't have the conjecture from plaintiffs.

THE COURT: Let me ask you something: So is it your argument that people are buying tea bags, and that should be looked at distinctly from the fact that they're buying tea as well?

MR. BRANSON: Almost. The argument is when you have on the box a statement -- the box is a finished tea bag product, and so when you have a statement like that, that says "Manufactured in USA," we're saying that that's what they're getting. They're not buying loose-leaf tea that came from overseas. This case isn't about loose-leaf tea.

They're buying that product. We're saying the statement applies to that and what is done here.

THE COURT: I understand that. It seems to me there's sort of a tipping point in this analysis, and that is you can make the argument that when you buy baby food, you're buying the jar and the convenience, but it seems hard for me to understand that when you're sitting down having a -- a child is eating something from that jar or when you're sitting down having a cup of tea, you're not munching on a tea bag or using the string for some purpose. You're using this consumable that happens to be very conveniently packaged. And I'm just trying, in my mind, to understand whether your argument isn't blurring the sort of fundamental distinction between the product and the packaging, and that's why I came back -- initially, I was saying, well, gosh, you know, or why have in a very prominent place "Manufactured in America 100 Percent" unless you're trying to create the illusion that the product itself, which is the consumable, is "Made in America," given the fact that you've already produced products that indeed are "100 percent made in America," because it seems to me most consumers may not be particularly interested in where tea is put into a particular package. Maybe, they are.

MR. BRANSON: I understand the Court's point on that. It's plaintiffs' burden to present what consumers

feel about anything, and we haven't seen it.

THE COURT: Okay. Fair enough.

MR. BRANSON: All right. So in terms of Colgan, as we laid out in the papers -- and I'll kind of touch on that a bit here -- we think it's clearly distinguishable, unlike plaintiffs. We think it's actually inapt because it ignores the difference between nonconsumable products and consumable products like ours that require some precise handling of organic material. The Leatherman products, you know, we view as kind of a sum of its parts -- it's a knife, it's a screwdriver, it's pliers. We believe it's a different scenario.

We -- there are also some other distinguishing factors --

THE COURT: Isn't it worse when you're dealing with a food product, though, as opposed to a mechanical item like a multi-purpose tool? I mean, isn't it more important that people -- when something says "Manufactured in America," if it's a food item, isn't that of greater significance when it comes to the intent of the labeling statute to -- a food item as opposed to a multi-tool?

MR. BRANSON: Well, I don't know if it's worse. I think the distinction, though, is we don't have any guidance as to what -- how the statutes would be applied to our situation where we don't have, you know, a sum of mechanical

parts versus a tea that needs to come over and be blended and handled and all that in the U.S.

I should also point out that in Colgan, there was -- the evidence was different. There was a declaration from Leatherman that actually admitted the manufacturing of the parts occurred overseas. We don't have that case here.

Also, the Leatherman defendant also presented no evidence of a lack of deception, which we presented, and we can get into that maybe a little bit later, but we have our own survey that shows no deception. We have plaintiffs' own testimony, and so I think there's some distinguishing factors of Colgan. We don't think the consumable context, Colgan does not apply to that.

Also, before I forget Your Honor mentioned "prominently displayed." We actually disagree with that. We have a section in our briefing about whether there has been a common exposure, and it's actually not on the front. It's on the back in the lower corner, and it's also in some versions on the underside of the box, and the print's not especially large. So we've laid out -- we understand the class certification ruling because it is on the box, but we've made that argument, but we haven't seen any demonstration from plaintiffs that the class members saw this.

THE COURT: Right. But I'm looking at one on the

back. The "100 percent" seems to be the largest font on the back, doesn't it?

MR. BRANSON: That's true, Your Honor, but it is on the back, and we've cited a couple of cases where judges have refused to even certify cases that have statements on the back.

THE COURT: Okay.

MR. BRANSON: On the point about the Charleston Tea video, that was Exhibit 41. Your Honor, that video -- I'm not sure if that was submitted in electric format -- but if you review it, there is a distinction made between the growing of tea and the manufacturing of tea. So there's no blurring of lines what's happening. The Charleston, I'm not sure it's the best example, but they do everything on site, but it's a tiny percentage. This is the only tea grown in the U.S. And I understand the discussion about whether consumers would -- it would be common knowledge if tea is grown here or grown overseas. Well, that was their burden to show what consumers view about where tea is grown or not grown, and it's not in the record.

THE COURT: Well, the argument is that the legislation trumps that particular argument.

MR. BRANSON: Let me get to that part of it, then.

On the materiality question, Your Honor, the mere existence that there are statutes that have applied -- been

applied in other contexts doesn't mean it's -- the challenged statements are material in every context. The Hinojos case, the Kwikset case, they talk about materiality being a fact question. There's not just a one size fits all, we say no matter -- there's a statement on here, it's material. Hinojos said, "Materiality turns on whether a reasonable consumer would attach importance to it."

Benson vs. Kwikset, "The analysis must occur from the perspective of consumers for whom geographic designation is important, and they must do reasonably."

So there's not a one size fits all. It's not, "Hey, this statement's on there, and this is material." That's not how this works. The cases pretty clearly say there's an objective analysis, and they didn't present any evidence to that end.

The Brown vs. Hain Celestial --

THE COURT: So, really, what you're saying is that notwithstanding the legislation, that producers of food items could put "100 percent Manufactured in the USA," and then the parties would need to engage in a survey or surveys and have a trier of fact resolve whether that matters, notwithstanding what the statute says?

MR. BRANSON: That's accurate.

THE COURT: Okay.

MR. BRANSON: Quickly, the Brown vs. Hain

Celestial case, that was a specific California statute. That's a private right of enforcement. So that's a completely different situation.

Let's see here. Quickly, on the -- got a little bit into the intent issue and why Bigelow put the statement on the box.

Cindy Bigelow said that she put that and counsel mentioned TeaProudly campaign, it really is just part of just highlighting that they're an American company and that the work they do overseas and all the plants -- I'm sorry, in the U.S., and all the plants are in the U.S., they're fully employed by people in the U.S., there's no international component to the Bigelow company at all. So that's why it's there.

There's no evidence that just because we reviewed -- Bigelow reviewed different types of phrasing on the box. I think that shows a good-faith analysis as to what might be appropriate or not be appropriate. I don't think that really carries the day for plaintiffs on that point either.

And with that, I think I covered the points, Your Honor, and I'm happy to sit.

THE COURT: Thank you very much. Appreciate it.

MR. WAND: Your Honor, I'll try to limit my -- some responses to what counsel just argued.

To begin on this issue of materiality, I think one thing that maybe didn't come across in the papers but is just a matter of common sense is it's sort of odd that Bigelow is claiming "Manufactured in the USA" is not material. Why would they put it on the packaging? Why would it be such a prominent part of their TeaProudly Campaign. I think common sense dictates that Bigelow thought it was important.

California law says one way to measure materiality is whether the maker of the statement thinks it's material. Cindy Bigelow testified that she thinks consumers -- some consumers care about "Made in the USA." So I just wanted to make that sort of common sense point.

Also, I think on the issue of Kwikset --

THE COURT: I think we talked about that. The point I made was essentially: Are consumers going to care where a particular tea bag is filled with tea? Is that the reason for this prominent -- I'm going to call it "prominent" -- maybe, I shouldn't characterize it, but this statement on the back so that was sort of the point I was trying to make.

MR. WAND: Right. Right. But if Bigelow wanted to say that, then they could have said that. They could have said -- they did say "blended and packaged" in very small font on the side panel, but -- so, respectfully, I'm

not convinced the argument that Bigelow just wanted to highlight that they're an American company really is convincing.

On the issue of Kwikset, Your Honor, I guess I heard -- the only distinction I heard about Kwikset from counsel was that they focus on this language from Kwikset that said, "In any event, materiality is usually a question of fact" to suggest that materiality is a question of fact and shouldn't be determined as a matter of law. But that language squarely supports our reading of that, and we cited cases that interpreted Kwikset in that way.

Because procedurally that language -- what the Court said was -- first, it said, "The statute means that 'Made in USA' is material as a matter of law," and then it ended in saying that the Court shouldn't grant a demur, that, in any event, materiality is a question of fact. So I think that actually strongly supports our reading that this is a very unique situation.

Your Honor, on the issue of prominence of the "Made in USA" Bug, first of all, I think the Court has already addressed that. That was in the issue of exposure. As Your Honor said, it is the largest claim on the back panel.

And I want to make clear for the record, Your Honor, I heard counsel say this, and I'm sure it's an

honest mistake, but I did hear him say that it is on the bottom panel. It is not on the bottom panel, Your Honor. It is on the back panel. All of the evidence shows that.

The one document that counsel submitted in its reply brief was a 2D mechanical, which is just a mock-up, the design of the box, and it said -- it's the top or the bottom, but in 2D that -- and they call it "the underside of the panel," but that is the back panel in 3D. So I really need to be clear, and I hope the defense corrects that, that the record is -- it is undisputed that the claim is on the back panel. It has never been on the bottom of the box.

And, also, just as a matter of law, prominence is not necessarily a requirement of exposure. Walker, the Ninth Circuit case we cited, says you can define a class based on exposure. There were these two cases, Zacaria and Hadley, where the Court said, "Hey, I'm still going to look at how prominent it is." So there is some authority for that, but in the actual discussion of reliance under California law, there is no prominence requirement. Hadley and Zacaria, as the Court has held and seems to agree with, is very different. It was buried -- it was in small font buried in the back.

So, regardless, we have a prominence requirement. "The Bug" is sufficiently prominent, but I just wanted to make the point that that's not even, from our perspective, a

requirement in the first place.

Turning to Colgan, Your Honor, I heard two points for why counsel doesn't think Colgan applies, one is just this idea that I think we were already discussing, which it's an agricultural product. I won't belabor that. There is absolutely no authority that suggests those products are not part of the "Made in USA" analysis.

And I heard counsel say that there's no guidance on this. Well, one, the Court doesn't need to look to FTC guidance. Actually, that was the position they were taking, is that the Court shouldn't look to FTC guidance, and we agree with that, the Court can just look to Colgan. But if there's any doubt, the Court could look to FTC guidance, and the FTC guidance discusses raw materials, and that is what I touched on before, which is the analysis is: Is it a fundamental part of the product and how far removed it is from the product.

So, again, the Court only needs to rely on Colgan, but if there's any distinction and the Court was to look to guidance, there's the FTC guidance on that issue.

And then the other point, I think, counsel distinguished Colgan -- and I honestly don't remember this part of the case, but I think counsel said that there was a declaration or that an executive or someone from Colgan admitted that it was made in the USA. Well, assuming that's

accurate, we have that here, too. We cited 30(b)(6) testimony from Bigelow where the representative admitted that manufacturing is a broader set of activities than blending and packaging, and we submitted several documents, one of which I discussed earlier, where Bigelow repeatedly calls this process tea manufacturing.

So that is effectively, from our perspective, an admission that, "Hey, this process is manufacturing tea."

I think counsel said, you know, that it's our burden, we haven't submitted evidence of how consumers understand "The Bug," et cetera. Well, just to be clear because there are overlapping issues between the two motions -- in our motion, our point was that we don't need to submit that evidence of consumer perception specifically in a survey, but in opposing Bigelow's motion, we have submitted that evidence. We have consumer perception survey evidence from our expert Mike Dennis.

Of course, we have the plaintiffs' testimony, which Colgan instructs is sufficient, and we've submitted evidence of independent complaints from consumers who have affirmatively reached out to Bigelow to complain.

And we also submitted evidence in opposing Bigelow's motion on materiality again in the form of Bigelow's own acknowledgements that "The Bug" is material, and our economic expert's calculation of the price premium

reflects materiality as well.

So in the context of opposing Bigelow's motion, we have submitted evidence on both deception and materiality.

And the last point I want to make, Your Honor, was just as a purely factual matter, I think I understood the Court to be asking counsel why does it matter if there's a 100 percent claim or not, and I absolutely agree with that if that's what the Court was getting at. I think Colgan and Kwikset and all the "Made in USA" cases and all of the authority we're aware of stands for that proposition. But just to be clear as a factual matter, the evidence is undisputed that "100 percent" representation modifies "Manufactured in the USA." Bigelow conceded that.

And we believe that -- again, there is no doubt, but if there was any doubt, the "100 percent" claim would dispel that doubt.

THE COURT: Thank you.

MR. BRANSON: A couple?

THE COURT: Yes.

MR. BRANSON: Thank you, Your Honor. I'll be brief here.

Counsel is making some common sense arguments off the top. Motions for summary judgment aren't about common sense. The evidence is what it is, and Bigelow employees testified to why they put it on there. They said that they

did it because they're proud of being an American company and what they did in America. There's not been any evidence to show that's somehow contradicted somewhere. It just isn't.

Counsel made a point about there's no cases that say that these statutes don't apply to consumables. Well, there's no cases that say they do apply. I think that argument kind of goes both ways.

There was a comment about that they have shown evidence of materiality. It's actually not accurate. The only survey that was done was done by our expert, Larry Shugarias (ph), where there was an AB test survey where he showed complete labels of Bigelow Teas that have the statement on it and complete labels without the statement on it, ran it through hundreds of people. There was no difference. There was no influencing of consumer purchasing decisions based on that statement. It's as if it wasn't there. At least, no one cared about it. So I think that's an important point. That was not rebutted, that survey. That's the only survey about tea and with full labels that were shown to consumers that has been done.

Dr. Dennis did a survey. He testified that he was not making any opinions about materiality. It's plain as day in the record, and we included that, Your Honor. He didn't show any labels or the products. He didn't even say

his survey was about tea products. So I don't think the Dr. Dennis survey really carries any water there.

And we made our point about Mr. Weir and our view about whether he should have isolated the statements, and so we don't view that as acceptable evidence of materiality either. And then I will wrap with that.

THE COURT: Very well. Thank you for your arguments.

Anything else?

MR. WAND: I would just make one point, Your Honor.

THE COURT: Go ahead.

MR. WAND: Dr. Dennis did submit photos in the survey of tea boxes and the labels and the referenced tea products.

THE COURT: Thank you. Submitted.

MR. WAND: Your Honor, if I could just, perhaps, one housekeeping matter potentially.

THE COURT: Go ahead.

MR. WAND: I think trial is currently set for August 20th. I just wanted confirmation if we should still plan on that or if we should discuss that?

THE COURT: Let's see what happens with the order and how it affects that. Have you already had a settlement conference?

MR. BRANSON: We had a mediation last year, but no settlement conference that I can recall with the judge.

THE COURT: I'll try to get an order out soon. I want to digest your arguments, and then we'll play it by ear in terms of -- I hate to have you worry about trial preparations. So I understand that. We have a little bit of time. I'll try to get the order out the next week or so. Maybe sooner. Thank you.

MR. BRANSON: Very well.

MR. WAND: Thank you, Your Honor.

(Proceedings concluded at 11:09 a.m.)

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript format is in conformance with the regulations of the Judicial Conference of the United States.

Date: November 18th, 2025

Lisa M. Gonzalez
/s/________________________________
Lisa M. Gonzalez, CSR No. 5920